Mission to the Bar. So I'm going to turn over the presiding position to Judge Hughes. Ms. Abernathy, will you please stand? May it please the Court, I move the admission of Margaret A. Abernathy, who is a member of the Bar and is in good standing with the District of Columbia. I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. I think the presiding judge will be pleased to know that she has an engineering degree from Duke University. The presiding judge knows that already. So I move her admission. I fully support the admission. The motion is granted. Welcome to the Bar. My next motion, may it please the Court, I move the admission of Rishi Raj Gupta, who is a member of the Bar and is in good standing with the highest court of New York and the District of Columbia. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. And I might add that his undergraduate is the University of California at Berkeley. So I know he's qualified. I support the motion. The motion is granted. Welcome to the Bar. Congratulations, both of you. Please stand and raise your right hand. Do you solemnly swear or affirm that you will comport yourself as an attorney and counsel to the District of Columbia and the Court of Duval, and that you will support the Constitution of the United States of America? I pledge allegiance to the flag of the United States of America and to the Republic for which it stands, one nation, under God, indivisible, with liberty and justice for all. Welcome. Okay. Toyota Motor v. Reactive Surfaces. The appellant ready? Mr. Cariton? Cariton, yes. You're reserving three? That is correct. Okay, I'll let you know if you start to run into it. Thank you. May it please the Court, Ola Cariton for the appellant, Toyota Motor Corporation. I want to begin with a threshold jurisdictional issue that's raised in our motion. The relevant statute, section 315A1. Mr. Cariton, on page 15 of the blue brief, you say, it was undisputed below that Buchanan addresses neither coatings or other material compositions nor applications for lipase or other enzymes nor methods of facilitating the removal of visually apparent fingerprint stains. But you also say it was undisputed below that Buchanan does not purport to characterize fingerprints according to the amount of visually apparent material they contain or explain how and why a visually apparent fingerprint stain becomes even less visible over time. Was that raised below? Yes. I think below the thrust of our argument was that Buchanan essentially doesn't have anything to do with the visibility of fingerprints. It's addressed a completely different problem. The problem it addresses is something that a forensic scientist might be interested in, which is whether a fingerprint that's left behind at a scene of a crime might be recoverable using conventional fingerprint powders. So it doesn't care whether that latent fingerprint is visible or not. All it's concerned with is whether by applying a fingerprint powder to that surface. On page 20 of the red brief, Reactive Services says that the need addressed in the 618 patent says nothing about the visibility of the stain, only its removal and maintenance. What is visible versus invisible in the patent? Well, the claim construction that Reactive proposed that we agreed to and that the board adopted explicitly required a reduction in the amount of visually apparent bio-organic material. So that visibility aspect is made explicit in the claim construction that was essentially stipulated by the parties. And Reactive admitted in the petition that the disclosure of the 618 patent is only directed to the visual observation of the fingerprint. I mean, when the 618 patent talks about the removal of a fingerprint, what it's saying is that for visual observation, the fingerprint can no longer be... On page 26 of the red brief, Reactive says we, quote, should not consider Toyota's visibility argument because it failed to raise this argument below. That's its waiver section. So where specifically in the record did you raise it below? Yes, so just for the record, I'd like to point out that Reactive admits on page 27 of its brief that Toyota argued that Buchanan did not teach or suggest a reduction in the quantity of visually apparent bio-organic material. So it appears that Reactive is drawing some distinction between a reduction in the amount of visually apparent material and a reduction in visibility. I'm not sure what that's... Could you identify, though, in the appendix where it is that you've made the distinction between non-visible and visible fingerprints? Yes, so if you please go to the joint appendix, and it would be appendix APPX 1123. And that's the patent owner's response. Is there a particular place on the page you want us to look at? 1143? I'm sorry, no, 1123. Oh, okay. So at the very bottom of what's page 31 of the patent owner's response, we argued that as much as the 618 patent addresses the problem of facilitating the removal of fingerprints, its focus is on patent visible fingerprints. And on the next page, we'll continue. The specific problem addressed by the invention is making patent fingerprints less visually apparent to the naked eye. So your main argument here on this issue is that the patent itself is only concerned about visible fingerprints. The prior art, Buchanan, is concerned with preserving fingerprints, whether they're visible or not. And your patent is directed to removal of fingerprints. Yes. The problem that's addressed by the patent is the removal of cosmetically and appealing fingerprint stains. And those stains can be found on various consumer products, like, for example, touchscreen devices. That's really the whole idea behind the invention. And Buchanan, and the same goes for the other prior art, is simply not concerned with the visibility of fingerprints. But Buchanan is concerned with, it talks about how it is that fingerprints could disappear and vaporize. And how, so in that effect, why isn't it at least relevant to one of Ordinary Scale New York, because it is concerned about fingerprints and why it is that sometimes they stay for a while and why it is that sometimes they disappear. Well, the key here is that when Buchanan says that a fingerprint has disappeared, it's not making any judgment about whether the fingerprint went from one quantity of visually apparent bio-organic material to a lesser quantity of bio-organic, I'm sorry, visually apparent bio-organic material. What it's saying then when it's talking about fingerprints disappearing is simply that the fingerprint can no longer be detected using conventional forensic dusting powders, which involve the application of chemical agents to the surface to enhance and visualize the fingerprint. But those fingerprints that Buchanan is talking about may not have been visible in the first place. And so Buchanan does not purport to quantify... But they could have been visible in the first place, right? But possibly, but Buchanan does not purport to quantify the amount of visually apparent material, does not purport to explain what might cause a reduction in the amount of visually apparent bio-organic material. So it's simply not concerned. Did you present any evidence that would show that a fingerprint stain might be visible and yet you couldn't detect whose fingerprint it was using the type of crime prevention techniques that are addressed in Buchanan? I'm not sure that issue was raised. I'm not sure... Well, it would be you who would have had to raise it if this is the argument you're making. Well, but I'm not sure why that would be relevant to the argument that we're making. The argument that we're making is simply that Buchanan did not purport to suggest that light-based activity on a fingerprint stain would facilitate a reduction in the amount of visually apparent material. I mean, at most what Buchanan suggests is that the breakdown and degradation of some portion of the lipid content of a fingerprint might make that fingerprint harder to detect with conventional powders because those powders rely on the interaction between oily materials in the fingerprint and the chemical agents in the powder. But Buchanan does not purport to suggest that the amount of lipids in a fingerprint would be relevant to whether that fingerprint is visually apparent or otherwise observable. It's simply not interested in even speculating about that subject. Let's move on. On page one of the Gray Brief, you say reactive surfaces does remarkably little to defend the PTAB's actual findings. And I wrote myself a note. Isn't that because you do remarkably little to attack the PTAB's actual findings? Where in the Blue Brief do you? Right. So, for example, I can direct you to their actual findings. Yes. To pages 46 and 47 of our brief. And specifically page 47. So here the point that we're making is that, and this is the second paragraph on the page, the evidence showed that fingerprint residue is a complex mixture of many components, including water, squalene, inorganic salts, cholesterol, as well as lipids. And the evidence also showed that the evaporation of some of those components would not necessarily be expected to reduce the visibility of the stain. For example, there's evidence in the record that when the water evaporates from a fingerprint, the result is actually a consolidation of the remaining materials in the fingerprint to a waxy layer. And the board did not identify any suggestion or expectation in the art that the breakdown and evaporation of the lipid portion of the fingerprint is going to lead to a reduction in the amount of visually observable material. And actually, as we point out here, their own expert, Dr. Rizzo, when asked at a cross-examination, would you have an expectation that lipase activity, so lipase breaking down the lipid portion of the fingerprint, if the smaller, more volatile molecules, is that going to lead to a reduction in visibility? And he said, well, basically it might depend on what's left on the surface, what other components would be left on the surface. On page 19 of the Gray Brief, you say, what does a reduction in the quantity of visually apparent bio-organic material mean, if not a reduction in visibility? Where do you raise that actual argument below? Well, the only reason we're raising this argument here is because Reactive is trying to draw a distinction between a reduction in visually apparent bio-organic material and a reduction in visibility. And when we talk about a reduction in visibility, all we mean is a reduction in the amount of visually apparent bio-organic material. I'm not sure what the distinction that Reactive, the distinction that they're making here, and maybe Mr. Ayer is going to elaborate, but it's the same argument that we raised below. It's that the claims require a reduction in the amount of visually apparent material. And that's the same argument that we're pursuing on appeal. And that's ultimately, the board made no finding. I mean, the board just did not even address this question of whether a reduction, the breakdown and evaporation of the lipid portion of the fingerprint could be expected to lead to a reduction in the amount of visually apparent bio-organic material. I want to ask you a couple questions about your motion. Sure. What is your basis for saying that the time bar under 315A1 or even 315D is jurisdictional? So, for example, this court held and clicked a call that the time bar in 315B is jurisdictional. When it dismissed, ordered that petition to be dismissed, it specifically ordered the petition to be dismissed for lack of jurisdiction. So there, the court is saying that 315B… We didn't have jurisdiction. No, no. It says that because the PTAP lacked jurisdiction to institute, the petition must be dismissed. And if 315B is jurisdictional, so is 315… I have some questions on this, too, if it's okay. Did the court actually examine the difference between jurisdictional time limits and time limits that are case processing rules and not jurisdictional? It seems to me that the language in click to call is pretty loose about whether it's actually a jurisdictional time limit or just a case processing rule. Well, I think that language… Are you aware of the Supreme Court precedent on that point, which tells all of us to be very careful about calling time limits jurisdictional? Yes, but I think that… What would you cite to say that this is those kind of jurisdictional time limits? I would cite the unblocked decision in Wi-Fi, because there the court described the time bar in 315B as a foundational limit on the board's authority to institute… That's not a jurisdictional limit, though. What about a Supreme Court case? Do you have a Supreme Court case that you would cite to support the position that this is jurisdictional and not just a time bar like a statute of limitations? Well, I think I might point to the decision in Quozo, because there it's a different context, but the court is addressing the scope of the appeal bar, and the court is drawing the appeal bar on institution decisions. Yeah, but that's a limit on our jurisdiction, and when you speak of Article III court's limitations, it's usually jurisdictional. When you speak of an administrative body's limitations, it's not usually couched in jurisdictional terms. Well, this court has… I mean, honestly, I think you're making your argument harder for yourself. Even if it's not jurisdictional, you raised it in your blue brief as soon as you were aware of click-to-call, and if the logic applies, shouldn't it still be dismissed? Yes, and to be clear, the jurisdictional point was made in alternative in the brief. I mean, our main argument that we made in our motion, the main argument that we made in our motion is that there was an intervening change in the law that occurred with click-to-call that basically qualifies this case for the change in law exception to waiver. That's really our lead argument, and really, I mean, I don't think there's any question here that click-to-call did change the precedent at the PTAB on this issue. I see that I'm well into my… You are, but I'll give you two minutes. I appreciate it. Thank you, Your Honor. May it please the Court. Peter Ayers on behalf of Reactive Surfaces. Mr. Ayers? Yes, sir. I'm going to sort of turn the obverse of a question. On page 26 of the red brief, you say Toyota waived its argument about the visibility of fingerprints by failing to raise it before the PTAB. Yes, Your Honor. Do you stand by that argument? We do, Your Honor, and I think it's important to understand the difference between a reduction in the amount of visually apparent material and the visibility of the fingerprint stain. And we think that it's the latter that was waived, not the former, as reflected in the Court's claim construction. And I would turn the Court to column 2 of the patent itself, where it equates a stain to the material itself. At column 2, line 38, it says, fingerprint stains typically include components of sweat gland secretions and sebum, which includes lipids, wax, and cellular debris. And if you turn to the claim itself, it merely requires the reduction of that material. It doesn't actually require that it be more or less visible, nor could it, because as we explained, it would raise an indefinite issue, because what is visible to one person may not be visible to another. There was a mention of a surface of a smartphone or something like that. I think, as we all know, that varies on just the angle at which you hold it. So where is it visible, straight on, at an angle? So that's what we say was waived below. It's this visibility test now that was not raised. You also have a substantive response to the argument, right, that it doesn't make a difference? You have a substantive response to this, what you consider a new argument. You also have a substantive response that you don't think it makes a difference in terms of whether the prior art teaches the claim limitations, right? We do, Your Honor. And this really, I think, first and foremost, gets down to whether the claim itself recites a new use or whether just a new discovered result. And the appellant relies on Bristol-Squibb-Myers and Rapoport to argue that this is a new use claim, and we argue that it is not. What those cases stand for, as well as this Court's decision in Perricone Medesis 432F1368, is that you have to look at the claim language to determine whether or not it's a new use or not. And if we turn to the claim here, what we see is that the claim is merely reciting a capability that follows from the steps that were preceding it. That is, facilitating the removal of a fingerprint by vaporization from the lipase-associated substrate or coating when contacted by a fingerprint. That is not a... If I understand correctly, that your position is that the other prior art? No, we're saying that this is an inherent result of the preceding steps. That is, that it's not actually a new use because the new use turns on whether or not the claim recites a manipulative step. And that's clear from, if you look at Perricone, the new use was applying the lotion to a sunburn area. That was the manipulative step. It was positively recited in the claim. Here, all this says is facilitating the removal of a fingerprint when contacted by a fingerprint. And that is, in fact, accomplished by associating a lipase with a substrate because the lipase will, by its very nature, degrade a lipid, which would make a reduction in the amount of visually apparent material. If I could get back to the waiver argument, Your Honor, because I think one thing that is missed here was the court's decision in Hamilton Beach v. Friel, 908F1328, which quite clearly held that a 315B argument can be waived. In that case, much like this one, the patent owner, after the appeal was pending, filed a motion to terminate based on intervening law, click-to-call. And this court said that that was effectively waived by the patent owner not filing a cross-appeal, which would have required the court to vacate the final written decision as opposed to reversing it. Sure, but they're not on the same procedural side. They're already asking us to vacate and remand the board's decision. This is just another reason to do it. That's absolutely true, Your Honor. But the point is that the question is whether— So procedurally, they don't need a cross-appeal. No, we don't have a Hamilton Beach process. You're just relying on Hamilton Beach for jurisdiction, right? That's right, sure. But that's, I mean—and I think, you know, I'm with you on this. This is not a jurisdictional time limit. It's a time limit on the board's ability to hear these things. Correct. But they raised it in their blue brief. Maybe the timing—maybe you can explain to me the timing, but they raised it relatively promptly in their blue brief after the call was decided. And why isn't that soon enough? Because it didn't allow the board to develop what we think are issues of first impression, both factually and legally, that this court would frankly benefit from their views on. What issues of fact would—I mean, the issues of fact are undisputed, aren't they? About when certain things were filed? That's true, but as we said, we think that there's— And the legal issue of whether 315B is similar to—it's 315A1 here? Correct. Whether they're legally similar is a legal question. We're going to review that de novo anyway. So why did—I mean, yes, perhaps they would have been wiser to raise the challenge to the board, but why are they—why is it necessarily waiver for them to raise it as soon as collective call is decided? Because at the time they were proceeding at the board, the board precedent was settled that it went the other way. Well, it was settled on 315B, we will agree, but it was not settled on 315A1. What about Microsoft Corporation versus Parallel Networks licensing, which is a PTAB decision from July 15, 2015, which states that the board's consistent position is that a prior action that is voluntarily dismissed without prejudice does not give rise to 315A1 or B statutory bars? We don't disagree, Your Honor, that there were board decisions, but only click-to-call was classified as precedential. And so other litigants were permitted to raise those issues below. Whether or not the board would have come out differently, we don't know. But we do think that there were some— But does it really matter, though? That's the point. Whether the board comes out differently or not, we're ultimately going to decide whether 315A1 and B are the same thing or not. So we agree, Your Honor, but we would also say that there are some factual issues, not necessarily about the filing itself, but about the relief that was sought. Because we know that just filing a complaint is not enough to trigger 315A. We could have filed, for example, as we did, a declaratory judgment for non-infringement. Can't those issues be handled if we determine that click-to-call applies here because 315A1 and B are similar? If you have any remaining issues about the facts, can't those be developed by the board on remand? Certainly, Your Honor. What I would say is that this is a pro se— sort of complicated because the petitioner in this case is both a lawyer, an owner, and a Ph.D. chemist who represented himself. And as the record reflects, I think that they've expended their resources below. So I'm not— Certainly, we don't think a remand is appropriate in this case, but we do agree that those facts could be developed. Any other questions, Your Honor? Doesn't look like it. Thank you. Thank you. I want to address just a couple of points that counsel made. One, counsel suggested that the precedent on 315A1 was not settled at the board when the petition was filed. And yes, technically, the oracle decision, the precedential oracle decision, the facts there did implicate specifically 315B. But its reasoning was that the precedent was not settled and its reasoning was much broader. I mean, basically, the panel there held that dismissal without prejudice nullifies the effect of disreport proceedings. And essentially, that reasoning was binding on panels addressing 315A1 as illustrated in the cases cited in our brief where dealing with 315A1, the board cited oracle as essentially right on point. And at no point, and I don't see any case cited in their opposition to our motion, where the board distinguished between 315B and 315A1 for this purpose. So effectively, the precedent was settled. And also, there was this question about whether it might make sense to remand the case back to the board to help develop the factual issues. We submit that there are no factual issues here to develop. I mean, the material facts are undisputed in that we have to file the complaint in federal court in Texas expressly seeking a judgment that the patent is invalid. And on the legal question, this court would be required to defer to the agency's interpretation of the statute only if the statute was somehow ambiguous. And here, the statute, 315A1, is not ambiguous. It's clear. There's no exception for it. I mean, we have to remand the case to the board anyway, right? They're the ones that have to terminate the IPR. So if we leave it to them to determine whether they think there are any factual disputes, isn't that up to them? I mean, we don't have a factual basis and a factual record, as your friend points out, to decide that. That may be an appropriate... I mean, I don't see any disputed facts, but that's up to you all to figure out. You'd have to figure it out. I think that's the thing. They haven't identified any material factual dispute. I mean, they talked about whether the complaint might be construed as a civil action challenging the validity of the patent. But the construction of a legal document is ultimately a question of law. I assume by that pronoun, you mean the other side rather than the board. Yes. I'm sorry. That's really all I wanted to address. Thank you. Next case, please.